PETER SETTERSTROM v. BRAINERD & NORTHERN MINNESOTA RAILWAY COMPANY.[1]

May 15, 1903.

Nos. 13,370—(52).

**Personal Injury.**

Three coaches and an engine were being moved and set upon a side track for the purpose of reversing their order in making up a train. It was the duty of one of the employees (the head brakeman) to be at his switch and set the same to aid in accomplishing this result. By reason of his abandonment of his post of duty and the unauthorized selection by him of another person to take his place, the switch was first properly set for a side track which was clear, then changed immediately,

[1] Reported in 94 N. W. 882.

and reset so as to cause a car being run or kicked backward from the engine to go upon another track, where cars were standing, in one of which plaintiff was engaged in scrubbing the floor, occasioning a collision therewith, whereby plaintiff was injured. *Held,* upon the facts:

## Proximate Cause.

1. That the act of the substitute for the head brakeman was a proximate cause of the injury plaintiff received.

## Responsibility for Substitute.

2. That the substitute was not an employee for whose acts defendant was directly responsible.

## Evidence.

3. That there is nothing in the evidence reasonably tending to show that other employees than the head brakeman were wanting in ordinary care.

## Contributory Negligence.

4. That the issue of plaintiff's contributory negligence was, under the evidence, for the jury.

## Negligence of Brakeman.

5. That whether the head brakeman was negligent in abandoning his post of duty and selecting a substitute to take his place was a question for the jury.

Action in the district court for Crow Wing county to recover $10,000 for personal injuries. The case was tried before McClenahan, J., and a jury, which rendered a verdict in favor of plaintiff for $1,600. From an order denying a motion for judgment notwithstanding the verdict, and denying a motion for a new trial upon condition that plaintiff consent to a reduction of the verdict to $1,000, defendant appealed. Reversed, and new trial granted.

*Koon, Whelan & Bennett,* for appellant.

*Polk & Polk,* for respondent.

LOVELY, J.

Plaintiff recovered a verdict for personal injuries caused by the collision of cars while a passenger train was being made up for use on defendant's railway. There was a motion for judgment, or a new trial in the alternative. The motion was denied, condi-

tioned upon the acceptance of a reduction of the verdict, to which plaintiff consented. Defendant appeals.

It appears that plaintiff's injuries were sustained while he was cleaning a car in the course of his employment as a servant of defendant during the interval between the arrival and departure of its passenger train at Brainerd on March 23, 1901. Defendant operated the train referred to, which was composed of an engine, combination car, and two passenger coaches making regular trips from Bemidji to Brainerd each day except Sunday, leaving Bemidji every morning at 7.15, and reaching Brainerd, some ninety-two miles distant, at 11.30 a. m. On its arrival at Brainerd it came into the Northern Pacific passenger station over the tracks of the latter company, and there discharged its passengers. Then, according to a custom adopted for that purpose, by switching, the order of the engine and cars was reversed, and about two and a half hours afterwards the train started on its return trip to Bemidji.

On the day of the accident, the engineer, Auge, and the fireman, Poppenberg, had charge of the engine. The crew operating the train consisted of a conductor, Brush; the head brakeman, Hart; and a baggageman, Carlton, who, on occasions, acted as brakeman. The conductor, on the arrival of the train at Brainerd, made his report, and was then at liberty to leave the train; the switching and reversing of the cars being attended to by the other employees by moving the engine on the main and north side tracks in the station yards west of the depot. This train, on the day referred to, arrived at Brainerd on time, and discharged its passengers. It then moved westerly upon the first north side track, the engine was disconnected, it passed westerly to the main track, then backed easterly thereon until it reached a turntable, where it was reversed. It then backed over the main and side tracks, and was reattached to the train. The switch was then immediately set for the main track, and the entire train pulled east upon it until it cleared the same, then backed westerly upon the main track. The engine, with the passenger car to which it was attached, was then cut off from the two remaining cars, and pulled forward some distance east of the switch.

At this time it was the duty of Hart, the head brakeman, to be at this switch, and set it for the side track, in order that the remaining cars might be moved thereon to put them in reverse order. In the last movement to set the cars upon the side track each coach would be pushed backward by the engine with sufficient force to enable the fireman, before the car reached the switch, to detach it from the engine, so that it could be run or kicked upon it by the momentum thus acquired a sufficient distance to give the remaining cars of the train ample room thereon. While it was the duty of Hart to operate the switch over which the cars were to be moved, he, on this occasion, left the train on its arrival at Brainerd to attend to his private business, having first made arrangements with a former employee of defendant, named Leath, to perform his duties while he was absent. This arrangement was unknown to defendant, and neither the engineer, fireman, or the other members of the train crew knew of it.

While the engine and coach were on the main track east of the switch, as above described, before starting to back down to throw the coach upon the side track, Leath, being in Hart's place, set the switch properly for the north side track, as was indicated by the switch target, which could be seen by the engineer and fireman upon the engine. Leath also gave the proper signal to back. This signal was received by the fireman on the left side of the engine, and transmitted to the engineer on the right. The engineer immediately turned to his levers, and applied force sufficient to give the necessary momentum to throw the detached coach backward upon the side track, when Leath, under a mistaken impression that the switch was set wrong, instantly changed it, so that it was set for the main track. Poppenberg, supposing that the switch was set for the side track, went to the coach, and cut it off, so that it might run backward by the force it had acquired from the engine, but, owing to the mistake of Leath, instead of going upon the side track, it passed the switch upon the main track, where, unless stopped, it would run against the car from which it had previously been detached. As soon as the fireman discovered that the car was going upon the main track he com-

menced setting the brakes to prevent the collision which seemed to be imminent. Carlton, the baggageman, about the same time, discovered that the car was going upon the main track; then from the place where he was got on the moving car, and attempted to set the brakes; but the efforts of the baggageman and fireman were not effective to prevent a collision with the cars on the main track, which occurred, throwing the plaintiff down while he was in the performance of his duties scrubbing the floor of one of the stationary cars, and for the injuries thus received he recovered the verdict now under review.

It was substantially conceded at the trial that Hart had no authority from defendant to put Leath in his place, and that the negligence of the latter directly contributed to and was a proximate cause of the collision; but the court left it to the jury to say whether the negligence of the engineer, fireman, and Carlton might not also have contributed to the accident, and it seems from its memorandum, as well as the brief of counsel, that much stress was laid upon the possibility that the engineer had applied too much force in kicking the colliding coach backward for the side track, when, through Leath's mistake, it went on the main track.

We have examined the entire record with much care, but are unable to find that there is any evidence therein reasonably tending to show that either the engineer, fireman, or baggageman were wanting in ordinary care in the performance of their duties at this time. The defendant's yard at the place of the collision was level, the side track was clear for a distance of two blocks, and there is nothing to show that the car would not have run thereon safely under the force given to it by the acts of the engineer had it not been for the mistake of Leath in inadvertently resetting the switch at a time when none of the employees engaged in the movement of the car could discover that he had done so. There is no reliable evidence in this case that the car, when it passed over this switch and collided with the stationary cars on the main track, was moving at a rate greater than four miles an hour. Some witnesses say the speed was less. Nor does it appear that this rate of speed would have been attended with any danger if the switch had remained as it was set when Leath gave the proper

signal for the engine and coach to be moved backwards, upon which the engineer was bound to act, according to the usual custom adopted in switching and making up this train.   It is true that one witness, who was sweeping the floor of one of the stationary cars, stated that the force of the collision shook down a stove pipe and broke the glass in the door and lamp, and undertook to estimate the rate of speed of the moving car he did not see when it struck.   When asked how fast the car was going, he stated,

"That is hard for me to say, but they went pretty fast, and I think everybody knows, who have seen trains switching, when they are looking at a car they know the car don't go very slow, and don't go very fast either; about, I should judge, twenty miles an hour."

Stress was laid upon this statement by plaintiff's counsel, but, while it may be conceded that the moving car struck with sufficient force to jar the stove pipe so that it fell down, that a window light was broken, and the lamp disarranged, the opinion that it was moving at the rate of twenty miles an hour is absurd.   If this had been so, the force of the collision must have broken more substantial portions of the stationary car than a lamp and window glass, and the baggageman could not have got upon the car.   All estimates of distance must, under such circumstances, be regarded as of doubtful value at best, and, when given in such haphazard and conjectural way, amounted to nothing more than a mere guess, and ought not to be made the basis of judgment by court or jury. It may be conceded that, had the engineer known that the car was going upon the main track when it was his duty to apply the force he did to send it upon the side track, the question of negligence would be for the jury; but upon all the evidence he had the right to believe that it was going upon the side track, which was clear, when he applied force not too great to send it there without danger.   Hence we cannot hold that he was obliged to divert his attention from his necessary and onerous duties at this time to speculate upon probable conditions he had no reason to believe existed from imaginary fears of hazards he could not foresee, and therefore was not required to guard against.

It is an elmentary principle, based upon reason and humanity, that it is not negligent to act reasonably upon the presumption that others will exercise ordinary care in the performance of duties imposed upon them. Particularly should this rule be applied where an employee using hazardous appliances, is attending to duties demanding his undivided attention, must obey the signals he receives from those by whom they are given; and there is nothing to show that the engineer, fireman, or baggageman had any reason to anticipate the sudden and negligent act of Leath in resetting the switch, and, if this action had been instituted against either of these employees for the injury to plaintiff upon the claim that either was negligent, we cannot believe that a jury could have determined the issue against them, if it had, we would unhesitatingly regard it as our duty to set it aside. The entire evidence demonstrates that these employees were exercising ordinary care in the performance of their duties, hence we are compelled to adopt the' view that the learned trial court, by authorizing the jury to pass upon their negligence, was in error.

It was insisted on the part of defendant that the plaintiff was himself negligent, he having been generally warned by other servants of the company not to stand upon the floors of the car during the switching operations. Since we have reached the conclusion that there must be a new trial, in passing upon the question of plaintiff's negligence we need not further refer to this contention than to say that it was a question for the jury. While plaintiff had received warnings, we cannot, as a matter of law, hold that he was required, under the evidence, to anticipate the extraordinary conduct of Leath, or the unexpected movement of the detached coach upon the main track.

In its general charge the court instructed the jury that defendant was in no way responsible for Hart's act in selecting Leath to do his work, and whether Hart, the head brakeman, was negligent in making the selection of Leath or putting him in his place did not concern the jury; thus taking out of the case the question whether Hart's abandonment of his duties to his employer, which might have endangered the safety of all other employees, in its causal relation to the collision, contributed to plaintiff's injury.

We think the learned trial court went too far in this respect. We may not, upon the record before us, lay down any precise rule of duty that should have governed the jury in passing upon the relations of Hart's acts to plaintiff's injury, for the trial court disposed of the case upon the theory that, no matter how negligent he was in putting another person in his place when he should have been there himself, without reference to the connection between such acts and the accident his conduct in that regard would not authorize a recovery. But we are very clear that the issue whether Hart was negligent was a question of fact and that circumstances attending his abandonment of his post of duty, and the putting of another person in his place without authority might have been a proximate cause of the injury, which should have been submitted under proper instructions, hence the failure to do so makes it necessary that a new trial should be ordered.

For the reasons indicated, the order appealed from is reversed, and a new trial granted.